*866 OPINION
By the Court,
Young, J.:
A jury convicted appellant Richard Allen Canape of murder in the first degree and armed robbery of the murder victim. Canape was sentenced to death. For the reasons set forth below, we affirm the convictions and the death sentence.
FACTS
On October 4, 1988, Manuel Toledo, a New Jersey resident, arrived in Las Vegas to go on a hunting trip in southern Utah. Toledo’s wife testified that her husband always carried two wallets on his hunting trips: a large wallet containing credit cards, identification, and spending cash; and a smaller wallet containing additional cash for emergency purposes. She testified that she helped her husband pack for the October 1988 trip and that he had both wallets when he left New Jersey.
After arriving in Las Vegas, Toledo rented a car and, several hours later, phoned his wife to inform her that he had arrived in Cedar City, Utah. On October 6, 1988, Toledo again called his wife to tell her that he had bagged an elk and would drive back to Las Vegas to catch a late flight home. Toledo left Cedar City and proceeded toward Las Vegas on Interstate Highway 15. He apparently ran out of gas about ten miles north of Las Vegas. At approximately 9:20 p.m., Toledo entered an AM-PM Mini-Mart *867 a few blocks off 1-15. The cashier at the AM-PM testified that Toledo filled two gas cans and that she loaned him a third can which he also filled. Toledo told the cashier that someone waiting outside was going to drive him back to his car. The cashier looked out the window and saw Toledo get into a car driven by a black male with sideburns. The driver wore a white hat.
On October 7, 1988, Robert Jiminez was driving on 1-15 toward Las Vegas when his car developed a vapor lock. He coasted to a stop behind another vehicle parked on the roadside. Jiminez got out of his vehicle and checked under its hood. He noticed debris scattered around the other vehicle, including gas cans, a pair of eye glasses, some twine and a watch. As Jiminez walked back to his car, he saw Toledo’s body lying down an embankment from the highway. He flagged down a passing motorist who contacted the police. While waiting for the police to arrive, Jiminez noticed a white hat lying on the ground halfway between the car and the body.
Examination of Toledo’s body revealed that he died from two gunshot wounds fired from a nine-millimeter weapon. Authorities found two shell casings near the body. When the police removed the body, they recovered a spent bullet which had passed through the victim’s head and lay on the ground underneath the body. Police found a white hat almost in a direct line between the car and the body, about halfway down the embankment. Examination of Toledo’s person revealed one wallet containing $1,400, but no driver’s license, credit cards or other identification. Toledo’s other wallet, the larger one in which his wife stated he carried his credit cards, identification, and spending cash was missing and never recovered.
Seventeen days after the Toledo murder, police arrested Canape for attempted armed robbery of a liquor store in Las Vegas. At the time of his arrest, Canape possessed a nine-millimeter, semi-automatic pistol. A Las Vegas Metro Police Department weapons expert examined the gun. The weapons expert compared shell casings and bullets from test firing the gun to the shell casings found at the murder scene and the bullet found under the victim’s head. The weapons expert positively concluded that the nine-millimeter pistol was the weapon used to kill Manuel Toledo.
Following his arrest for the liquor store robbery, police towed Canape’s car to their impound lot. The cashier from the AM-PM store where Toledo filled his gas cans viewed Canape’s car and told the police that it looked similar to the car in which Toledo rode away on the night of his murder. The cashier also stated that the hat found at the murder scene looked similar to the one the car’s driver wore on the night he drove away with Toledo.
*868 Canape was charged with the murder and robbery of Manuel Toledo. At trial, Mrs. Toledo testified to the circumstances of her husband’s hunting trips to Utah, by way of Las Vegas. She also recounted that her husband always carried two wallets. She stated that the hat found at the murder site did not belong to her husband and that she had never seen it before.
A search of Canape’s car following his robbery arrest uncovered a photograph album containing pictures of Canape. In one of these photos, Canape is pictured wearing a white hat similar to the one found at the murder scene. The cashier from the AM-PM testified that the man in the photo resembled the man with whom Toledo rode away on the night of the murder.
The search of Canape’s car also revealed a length of twine. A hair and fiber analyst testified that the twine from Canape’s vehicle was, within scientific certainty, the same type as that found at the crime scene. The same expert testified that hair samples taken from Canape were similar to hair found in the hat recovered at the murder scene.
The jury found Canape guilty of murder with a deadly weapon while in the commission of a robbery. He was also convicted of the robbery as a separate offense. In the penalty phase, the State presented evidence of four aggravating circumstances. The State offered evidence that Canape had a five-year sentence for a 1983 felony conviction in Hawaii. The defense did not present any mitigating evidence, electing instead to dispute the evidence supporting the aggravating factors. Canape received a death sentence.
DISCUSSION
On appeal Canape argues that (1) the State presented insufficient evidence concerning robbery, and the trial court erred in its instructions to the jury regarding this crime; (2) the failure to provide a complete record on appeal amounted to a denial of Canape’s right to due process; (3) prosecutorial misconduct deprived Canape of a fair penalty hearing; (4) the court erred in its reasonable doubt jury instruction; (5) requiring Canape to wear shackles during the penalty phase violated his constitutional rights; and (6) the trial court erred in its instruction to the jury regarding aggravating circumstances.
We hold that all of Canape’s contentions are without merit.
I. Sufficiency of evidence of robbery.
Canape first contends that the State presented insufficient evidence to support instructing the jury on robbery, both as a separate offense and as a basis for invoking the felony murder *869 doctrine. The standard of review for sufficiency of evidence upon appeal “is not whether this court is convinced of the defendant’s guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could be convinced to that certitude by evidence it had a right to accept.” Edwards v. State, 90 Nev. 255, 258-259, 524 P.2d 328, 331 (1974).
Canape points out that the cashier from the AM-PM was the only person other than the killer who had contact with Toledo before his death after the victim left Utah to return to Las Vegas. Canape argues that the State presented no proof that Toledo carried his second wallet at the time of his death and presented no evidence that Toledo paid for gas with a credit card. Canape also points out that the victim had over $1,400 on his person, that his watch was not taken, that his luggage sat undisturbed, and that his hunting rifle lay untouched in the rental car’s trunk. From these facts, Canape asserts that the State failed to establish robbery as a basis for Toledo’s death. He argues that any theory on the fate of Toledo’s other wallet is necessarily speculative: there was no evidence that Toledo possessed the second wallet on the day of this death.
We acknowledge that evidence of robbery in this case was entirely circumstantial. However, we have long recognized that circumstantial evidence may constitute the sole basis for a conviction. Deveroux v. State, 96 Nev. 388, 391, 610 P.2d 722, 724 (1980). In support of the robbery theory, the State adduced the following evidence: (1) Toledo normally carried two wallets, a large one and a small one, but only the small wallet was found; (2) the large wallet, containing Toledo’s credit cards and identification, was never found; (3) the large wallet also contained Toledo’s spending cash; (4) shortly before his death, Toledo purchased two one-gallon gas cans from a 7-11 market and borrowed a third gas can from the cashier at a nearby AM-PM market, where Toledo purchased and paid for gas; (5) no change from the purchase of the gas cans nor gas was found with Toledo’s other personal property near his car or on his body; (6) the small wallet with $1,400 which Toledo kept for an emergency was found on his body in a pants pocket, apparently overlooked by his killer; (7) when Toledo purchased the gas, the cashier from AM-PM testified that Toledo pointed to a car with a black man wearing a white hat who Toledo said was going to take the gas and Toledo back to his vehicle; (8) the cashier testified that when Toledo pointed to the car, the driver slid down in the seat and pulled a white hat over his face; (9) the cashier further testified that the picture of Canape in a white hat found in his photograph album looked similar to the “image I have of the person whom I saw in the car”; (10) police found evidence of a struggle on the *870 ground by Toledo’s car; (11) two of the gas cans had been emptied into Toledo’s car, but the third can still contained some gas and there was evidence of spilled gas beneath the gas tank; (12) on the ground near the back of Toledo’s car, the police found the victim’s property including his wristwatch with a damaged wrist band, his glasses, a black comb, and other personal items; (13) among items on the ground by the car was a piece of plastic twine about four millimeters in diameter stained with what appeared to be several drops of blood and which was identical to twine found several weeks later in Canape’s vehicle; (14) authorities observed several drops of blood on pebbles on the ground near Toledo’s personal property; (15) the pathologist testified that in addition to two bullet wounds in Toledo’s body caused by bullets from Canape’s pistol, the victim’s body contained other indications of trauma, namely, a dark triangular spot on the left eyebrow with a laceration approximately three-quarters of an inch long which would have bled, a blunt laceration on the right side of his face, bruises on the upper and lower lips, and an abrasion on the left elbow; and (16) the keys to the victim’s rental car were never found.
A jury, acting reasonably, could conclude beyond a reasonable doubt that Toledo was robbed prior to his death. Indeed, Canape’s counsel admitted in argument to the jury during the guilt phase, “The obvious motive in this case was robbery.” Later, he conceded in the penalty phase argument that the robbery at the time of Toledo’s death “had been proved beyond a reasonable doubt.”
We hold that the evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Canape robbed Toledo prior to his death. Accordingly, we find no error in the trial court’s instruction to the jury on robbery as a separate offense and as a basis for the felony murder doctrine.
II. Sufficiency nf record on appeal.
Portions of the record on appeal in this case are missing, namely, the transcripts of the proceedings following defense counsel’s closing argument, including the State’s rebuttal closing argument and the reading of the verdict. Canape contends that the State’s failure to provide him with a complete record of the proceedings below violates due process.
On April 15, 1990, Canape’s counsel filed an affidavit with this court stating that the record was incomplete and, therefore, this court should remand this case for a new penalty hearing. In an order dated May 8, 1990, this court stated that Nevada Rule of Appellate Procedure (NRAP) 10(c), allowing supplementation of the record by permission of the court, provided the proper means *871 of dealing with the problem. On June 14, 1990, Canape filed a supplementation of record pursuant to NRAP 10(c) containing an affidavit of trial counsel reconstructing what occurred during the proceedings that should have been reported in the missing portion of the transcript. On September 27, 1990, this court filed an additional order stating that Canape had properly supplemented the record.
Respondent argues that Canape is estopped from objecting to the form of the record because he was given full opportunity to cure any defects in the record by way of this court’s NRAP 10(c) order. We agree with respondent’s argument. In addition, we do not believe Canape suffered prejudice from the omissions from the record, as his counsel did not lodge any objections in the missing portion of the record (the State’s rebuttal closing argument). Instead, all of the alleged prosecutorial misconduct, discussed below, occurred either in voir dire or in the opening statement of the penalty phase hearing. See State v. Miller, 698 P.2d 1123 (Wash.Ct.App. 1985).
III. Prosecutorial misconduct.
Canape also contends that the prosecution made a number of improper and prejudicial remarks to the jury during the trial and at the sentencing hearing. A review of the record reveals that Canape failed to object to the prosecutor’s alleged improper remarks during either the guilt or penalty phases. Thus, we hold that Canape’s failure to object to these statements precludes consideration of this alleged misconduct on appeal. Watkins v. State, 93 Nev. 100, 102, 560 P.2d 921, 922 (1977).
IV. Reasonable doubt instruction.
Canape next contends that the trial court’s instruction on reasonable doubt violated his right to due process.[1] The instruction in question was based upon NRS 175.211(1). We previously upheld the constitutionality of NRS 175.211(1) and its use as a jury instruction in Brimmage v. State, 93 Nev. 434, 442-443, 567 P.2d 54, 59 (1977), and Cutler v. State, 93 Nev. 329, 336, 556 P.2d 809, 813-814 (1977).
*872 Canape’s challenge to the instruction is based upon Cage v. Louisiana, 498 U.S. 39, 40-41 (1990), wherein the Supreme Court held that a reasonable doubt instruction employed at trial, taken “as a whole,” might have confused and misled the jury. A challenge to the Nevada reasonable doubt instruction, premised on the Cage decision, was recently mounted in Lord v. State, 107 Nev. 28, 806 P.2d 548 (1991). In Lord, we upheld the validity of the NRS 175.211 instruction after finding that it was clearly distinguishable from the instruction invalidated in Cage. Lord, 107 Nev. at 40, 806 P.2d at 556. We reach the same conclusion here and find that Canape’s contention is without merit.
V. Canape’s appearance in shackles before the jury.
Before the start of the penalty phase of Canape’s trial and outside the presence of the jury, the prosecutor pointed out to the court that Canape was not shackled. The prosecutor argued that Canape had just been convicted of first degree murder and represented a safety and flight risk. Defense counsel argued that Canape gave no indication of being a safety risk or of fleeing. The court acknowledged this, but nevertheless ordered Canape’s feet shackled.
Canape argues that this order violated the Fifth, Sixth, Eighth and Fourteenth Amendments. He cites Estelle v. Williams, 425 U.S. 501, 504-505 (1976), holding that a state cannot, consistent with due process and equal protection guarantees, compel an accused to stand trial while wearing identifiable prison clothing. Canape also cites Grooms v. State, 96 Nev. 142, 144, 605 P.2d 1145, 1146 (1980), wherein this court held that a criminal defendant has the right to appear before a jury clad in normal clothing without visible restraints: “When such error has occurred [permitting the jury to view defendant in handcuffs], it is our duty to reverse a conviction unless it is clear that the defendant was not prejudiced thereby.” Id.
We addressed the issue of whether a defendant may be shackled during a penalty proceeding in Duckett v. State, 104 Nev. 6, 11, 752 P.2d 752, 755 (1988), and held that a defendant’s constitutional right to appear before a jury free of prison clothing and restraints no longer exists at a penalty hearing because public safety concerns are accorded greater significance once a jury returns a finding of guilt. Decisions regarding the physical restraint of a defendant at the penalty stage are left to the discretion of the trial court after it has balanced public safety concerns against the potential for prejudice to the defendant. We will not disturb this decision on appeal absent an abuse of discretion. Id.
*873 We hereby ratify our conclusion in Duckett and hold that no violation of Canape’s constitutional rights occurred when he appeared before the jury in shackles at the penalty hearing.
VI. Aggravating circumstance instructions.
The trial court gave Instruction No. 7 informing the jury of circumstances by which the first degree murder could be aggravated.[2]
A. In the instant case, the first circumstance related to murder committed by a person previously convicted of a violent felony, NRS 200.033(3). This circumstance is not challenged on appeal. The prosecution introduced into evidence a certified copy of a judgment of conviction of Canape for armed robbery in Las Vegas, committed seventeen days after the murder of Toledo.
B. The second circumstance was that the murder occurred “in the commission or attempt to commit a robbery.” NRS 200.033(4). Canape argues that (1) there was insufficient evidence to prove that Toledo was robbed prior to his death; and (2) the court erred in instructing the jury that it could consider robbery as an aggravating circumstance. During oral argument during the guilt phase, Canape’s counsel stated, “The obvious motive was robbery.”
At this point in the opinion, it is not necessary to marshal again all the evidence supporting the robbery theory. The following evidence, however, is worthy of reemphasis: (1) the gun taken from Canape at the time of his arrest for armed robbery in Las Vegas seventeen days later, after Toledo’s murder, fired the fatal bullets; (2) twine found on the disturbed ground near Toledo’s car matched twine taken from Canape’s vehicle after his arrest; (3) a white hat found near Toledo’s body looked similar to the hat worn by Canape in his photograph album; (4) all fifty-six hairs in the white hat matched the unusual characteristics of Canape’s *874 hair samples; (5) the clerk at the AM-PM market where Toledo purchased gas testified that the man with the white hat shown in the photograph was similar to the “image” of the black man driving the car in which Toledo was a passenger shortly before he was murdered; and (6) Canape’s counsel admitted in argument in the guilt phase that “[t]he obvious motive was robbery.”
Accordingly, we hold that sufficient evidence was presented in the penalty phase to support beyond a reasonable doubt the jury’s conclusion that Canape was guilty of murder while engaged in the commission of or attempt to commit robbery.
C. The jury was also instructed that a murder committed to avoid or prevent a lawful arrest (NRS 200.033(5)) constituted an aggravating circumstance. Canape argues that the court improperly instructed the jury on this issue. He cites Jimenez v. State, 105 Nev. 337, 775 P.2d 694 (1989), wherein this court reversed the penalty portion of appellant’s conviction after finding that there was no factual basis for concluding that the appellant murdered the victim to prevent or avoid lawful arrest. Id. at 343, 775 P.2d 698.
The facts in Jimenez are clearly distinguishable from those in the instant case. In that case, the two victims were found in a bar the day after it had been robbed. There was no evidence indicating that they were killed while appellant attempted to flee or that appellant killed to avoid arrest.
In the case at bar, we hold adequate evidence supported the conclusion that Canape sought to prevent the victim from identifying him as the robber. The evidence showed that at the AM-PM market, the store clerk loaned Toledo a gas can. Toledo and the clerk discussed the method of the can’s return. Toledo pointed to Canape’s car and indicated that the driver would transport him back to Toledo’s vehicle. The clerk testified that when Toledo pointed to the car, Canape pulled a white hat (similar to the one shown in his photograph album) over his face and slid down in the seat.
Canape presumably had good reason to be apprehensive about the threat Toledo posed if he lived. They rode together in the car. Toledo had heard Canape talk and presumably could identify him. Canape drove an old car with a Hawaii license plate. On returning to the Toledo vehicle, which apparently had its emergency lights activated,[3] the unsuspecting victim presumably emptied two cans of gas into his rental car and started to put the contents of the third can into the tank. The jury could reasonably *875 infer that at this point, Toledo was interrupted, and the interruption caused a sizeable gas spill on the ground beneath the tank.
Near the gas cans, where it appears a violent struggle occurred, Toledo’s glasses and comb lay on the ground along with other personal property, as if Toledo’s pockets had been emptied. Police never located Toledo’s car keys. Toledo’s large wallet with identification, credit cards and spending cash was presumably taken at this time and never found. The victim’s wristwatch with a damaged wrist band was found on the ground, apparently torn from his wrist during the confrontation.
The pathologist testified that the lacerations on Toledo’s face would have bled. Drops of blood on the pebbles and on the twine presumably came from trauma to the victim’s face. Someone facing Toledo, as in a struggle, caused the bruises and lacerations.[4]
The jury could reasonably infer from the evidence that after the robbery, the victim ran or was forced to walk away from the 1-15 freeway. Another ground disturbance was observed forty-six feet from the first disturbance. At this point, authorities found Canape’s white hat. The victim’s body lay twenty-four feet farther on.
Toledo was shot in the back about twelve inches below the base of the skull. The pathologist testified that his spinal cord was severed by the bullet which then struck the aorta of the heart. A shell casing from the murder weapon was found between the victim’s spreadeagled legs. A second bullet was fired with the gun in contact with the victim’s skull.
When killed, Toledo was clearly moving away from his car. The jury could reasonably infer that the robbery had already occurred some seventy feet away back near the car and that Canape, seeking to avoid arrest and prosecution, brutally shot Toledo in the back.
In Cavanaugh v. State, 102 Nev. 478, 729 P.2d 481 (1986), we held that it was unnecessary that arrest be imminent, and where the appellant clearly murdered the victim to avoid arrest, no more is required under the statute.
Accordingly, we hold that sufficient evidence existed to justify the court giving that portion of Instruction No. 7 which states that an aggravating circumstance exists when a murder is committed for the purpose of avoiding or preventing a lawful arrest.
Canape next alleges that the court erroneously instructed the *876 jury on depravity of mind as an aggravating circumstance. The court gave Instruction No. 8, which reads as follows:
The condition of mind described as depravity of mind is characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.
In Godfrey v. Georgia, 446 U.S. 420, 428 (1980), the Supreme Court requires jurisdictions imposing the death penalty to “channel the sentencer’s discretion by ‘clear and objective standards’ that provide ‘specific and detailed guidance,’ and that ‘make rationally reviewable the process for imposing a sentence of death.’” In Robins v. State, 106 Nev. 611, 629, 798 P.2d 558, 570 (1990), this court said,
[W]e construe the instruction [identical to Instruction No. 8] and the statute (NRS 200.033(8)) upon which it is based as requiring torture, mutilation or other serious and depraved physical abuse beyond the act of killing itself, as a qualifying requirement to an aggravating circumstance based in part upon depravity of mind.
The State asserts that this murder falls within the Robins parameters and that accordingly the court properly instructed on depravity of mind. See Rogers v. State, 101 Nev. 457, 705 P.2d 664 (1985), cert. denied, 476 U.S. 1130 (1986). In reply, Canape contends that the instruction was error because the victim died almost immediately and either shot would have been fatal by itself.
As Justice Kennedy stated in Neuschafer v. Whitley, 816 F.2d 1390, 1393 (9th Cir. 1987), where a similar issue emerged:
We need not address [the depravity of mind] contention, however, for it would be of no avail to the petitioner. The jury found additional and specific aggravating factors which, under both Nevada law and controlling constitutional principles, justify imposition of the capital sentence.
Clemons v. Mississippi, 494 U.S. 738 (1990), undergirds the holding in Deutscher v. Whitley, 884 F.2d 1152 (9th Cir. 1989), which considered the same Nevada statutory language as the case at bar. In Deutscher, counsel argued for a new trial contending that the statutory language regarding depravity of mind was unconstitutionally vague. The court stated:
Because the jury found two aggravating circumstances besides the torture, depravity of mind, or mutilation circum *877 stance . . . Neuschafer v. Whitley, 816 F.2d 1390, 1393 (9th Cir. 1987) (citing Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)), would require affirmance as to this issue had we not decided to reverse on the basis of Deutscher’s ineffective assistance claim.
Deutscher, 884 F.2d at 1163.
In line with this reasoning, we find it unnecessary to reach the merits of this issue in the present case.[5] Rather, under Clemons, we elect to reweigh the three valid aggravating circumstances against evidence of mitigating circumstances.[6]
VII. Determining death eligibility.
For guidance to the jury in determining the punishment in the instant case, the trial court gave Instructions Nos. 4, 5 and 6.[7] *878 The prosecuting attorney devoted considerable time to explaining to the jury its responsibilities. He clearly stated that the jury could not impose the death penalty unless the jury found at least one aggravating circumstance established beyond a reasonable doubt and further that no mitigating circumstances existed sufficient to outweigh the aggravating circumstance or circumstances found.[8]
The court considered mitigating Instructions Nos. 10 and 10A.[9] Canape’s counsel objected to the giving of Instruction 10A *879 on the ground that he felt it would allow the prosecutor to take each of the circumstances in turn and argue that no evidence supported it. A careful review of the record indicates that Canape’s counsel did not present evidence of any kind on behalf of Canape at either the guilt or penalty phase.
In Deutscher v. Whitley, 991 F.2d 605, 606-07 (9th Cir. 1993), the court stated on remand from the United States Supreme Court that in Nevada, which is a “weighing state,” the procedure is as follows:
A Nevada sentencer must consider and weigh both mitigating and aggravating circumstances before it can determine whether a defendant is eligible for the death penalty. The statute provides:
Every person convicted of murder of the first degree shall be punished:
(a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.
Nev. Rev. Stat. Ann. § 200.030(4)(a) (1992) (emphasis supplied).
The jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.
Under Clemons, we affirm Canape’s death sentence. Because the Clemons decision will have a major impact upon this court’s future disposition of appeals challenging the death penalty where a defendant raises a question regarding the validity of an aggravating circumstance, we believe some discussion is warranted.[10]
The Mississippi death penalty statute at issue in Clemons, like NRS 200.030(4), requires the weighing of aggravating and mitigating circumstances prior to imposition of the death penalty. After Clemons was found guilty of first degree murder, the State alleged two aggravating circumstances during the penalty phase of his trial: (1) commission of the murder during a robbery for pecuniary gain; and, (2) commission of a murder that was “especially heinous, atrocious or cruel.” The jury found both aggravating factors present and that no mitigating circumstances outweighed the aggravating factors. It imposed the death penalty.
The Mississippi Supreme Court affirmed. It acknowledged that *880 the “especially heinous” factor was unconstitutionally vague under Maynard v. Cartwright, 486 U.S. 356 (1988), but did not require reversal because “when one aggravating circumstance is found to be invalid or unsupported by evidence, a remaining valid aggravating circumstance will nonetheless support the death penalty verdict.” Clemons v. State, 535 So.2d 1354, 1362 (Miss. 1988).
On certiorari to the United States Supreme Court, Clemons argued that only a jury has the right to impose the death penalty and an appellate court cannot reweigh the balance of factors when the jury has found and relied on an invalid factor. The Court disagreed:
Nothing in the Sixth Amendment as construed by our prior decisions indicates that a defendant’s right to a jury trial would be infringed where an appellate court invalidates one of two or more aggravating circumstances found by the jury, but affirms the death sentence after itself finding that one or more valid remaining aggravating factors outweigh the mitigating evidence.
Clemons, 494 U.S. at 745.
The Court also found no inconsistencies between appellate reweighing and its prior Eighth Amendment analysis:
[A] similar process of weighing aggravating and mitigating evidence is involved in an appellate court’s proportionality review. . . .
We accordingly see nothing in appellate weighing or reweighing of the aggravating and mitigating circumstances that is at odds with contemporary standards of fairness or that is inherently unreliable and likely to result in arbitrary imposition of the death sentence.
Id. at 749-50.
In Clemons, only one aggravating circumstance remained valid, namely, that the murder had been committed “during ... a robbery for pecuniary gain.” Clemons, 494 U.S. at 742. In the instant case, we hold that three valid aggravating circumstances existed, namely, (1) murder committed by a person previously convicted of a violent felony, (2) murder committed in the course of a felony, and (3) murder committed to avoid arrest.
In Clemons, the defendant’s mother and a psychologist presented evidence of mitigating circumstances.[11] In the instant case, *881 Canape did not testify,[12] nor did he call witnesses on his behalf to present mitigating evidence.[13]
We have thoroughly searched the record and find no evidence of mitigating circumstances, even in the case presented by the prosecution. The absence of specific mitigating evidence presented a daunting challenge to Canape’s counsel who sought to fill the vacuum by arguing,
If you have reservations or doubts or questions,[14] that’s a mitigating circumstance. You don’t need to number them or articulate them. You don’t need to say I think this is a mitigating circumstance. All you have to do is feel it is not appropriate in this case. If you feel uncomfortable about it, if you feel there are questions in your mind doing it, those are mitigating circumstances. That’s all it takes. You don’t have to find any at all. A best mitigation is your gut feelings.
VIII. Weighing under Nevada law.
We turn now to a consideration of whether our review of mitigating and aggravating circumstances under Clemons requires us to make impermissible findings of fact under Article 6, Section 4 of the Nevada Constitution[15] and NRS 177.025.[16] We conclude it does not.
*882 As Justice Holmes stated in Towne v. Eisner, 245 U.S. 418, 425 (1918): “A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.” Similarly, while factual determinations are generally associated with trial courts, they are an integral part of appellate proceedings under some circumstances.
As stated in Clemons, 494 U.S. at 748-49: “It is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in ‘weighing’ States, to consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed.”
Historically, the Nevada Supreme Court has frequently been called upon to make a factual determination whether there is substantial evidence to support a verdict. Until relieved of this responsibility by the 1985 legislature, our court routinely engaged in proportionality review of death sentences. This required weighing of aggravating and mitigating evidence. We are still required to weigh evidence in considering whether the death sentence is excessive or the result of passion, prejudice or any arbitrary factor. NRS 177.055.
We conclude, therefore, that a weighing in the instant case pursuant to Clemons does not violate Nevada’s Constitution or statutes.
In the case at bar, three aggravating circumstances existed with “no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.” NRS 175.554(2)(c). Accordingly, Canape was death eligible and the jury in its discretion could consider the sentence of death as an option.
Considering the appeal on a harmless error analysis, we reach the same result. Conceding, arguendo, the absence of a factual basis for the depravity of mind instruction, upon review of the entire record we conclude beyond a reasonable doubt that the error was harmless. The record contains no mitigating circumstances. The weight properly accorded to the valid aggravating circumstances made Canape death eligible. The proof of Canape’s guilt was overwhelming and, in fact, virtually uncon-troverted. We conclude, therefore, that beyond a reasonable doubt, the jury would have reached the same result if depravity of mind had not been included as an aggravating circumstance.
As we stated in Beets v. State, 107 Nev. 957, 965, 821 P.2d 1044, 1050 (1991) (where the depravity of mind instruction was also called into question), “[cjonsidering these circumstances, and the lack of any mitigating circumstances whatsoever, we *883 conclude that the infirm aggravating circumstance based upon depravity of mind is harmless beyond a reasonable doubt.” See also Neuschafer v. Whitley, 816 F. 2d 1390 (9th Cir. 1987).
We further hold that Canape’s sentence was not imposed under the influence of passion, prejudice or any arbitrary factor. In addition, we conclude that Canape’s sentence of death is not excessive considering both the crime and the defendant.
Accordingly, we affirm Canape’s convictions for robbery and murder in the first degree and we affirm Canape’s sentence of death.[17]
Rose, C. J., and Steffen, J., concur.

The instruction in question read as follows:
A reasonable doubt is one based on reason. It is not mere possible doubt but is such doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and substantial, not merely a possibility of [sic] speculation.

Instruction No. 7 reads as follows:
You are instructed that the following factors are circumstances by which Murder of the First Degree may be aggravated:
(1) The murder was committed by a person who was previously convicted of a felony involving the use or threat of violence to another, to-wit: Robbery With Use of a Deadly Weapon in Case No. C86093 in the Eighth Judicial District Court of the State of Nevada in and for the County of Clark.
(2) The murder was committed while the person was engaged in the commission of or an attempt to commit any robbery.
(3) The murder was committed for the purpose of avoiding or preventing a lawful arrest.
(4) The murder involved depravity of mind.

An investigator testified that on arriving at the crime scene, he checked Toledo’s car and found the emergency light switch on and a dead battery.

Jerry Cohen, owner of the liquor store held up by Canape seventeen days later, said that Canape “stuck a gun in my face and backhanded me in the eye.”

We note, however, that Stringer v. Black, _ U.S. _, 112 S.Ct. 1130, 1136 (1992), requires this court, in affirming Canape’s conviction, to analyze the role the invalid aggravating factor played in the sentencing process. After a thorough examination of the entire record, and given that Canape presented no mitigating circumstances and considering the other valid aggravating factors, we conclude that the arguably invalid depravity of mind aggravating circumstance was not a significant factor in the sentencing process.

Canape’s counsel admitted in the penalty argument to the jury that two aggravating circumstances existed, saying: “You found him guilty of robbery. That gave the state an aggravating circumstance to seek the death penalty!.] [T]he judgment of conviction on . . . the robbery that occurred after the robbery/murder . . . [fihat’s another aggravating circumstance. Those have been proved beyond a reasonable doubt.”
In this decision, we hold there was a third aggravating circumstance, namely, that the murder was committed to avoid a lawful arrest.

The instructions read as follows:
INSTRUCTION NO. 4:
The jury shall fix the punishment at:
(1) Death, or
(2) Life imprisonment without the possibility of parole, or
(3) Life imprisonment with the possibility of parole.
INSTRUCTION NO. 5:
The State has alleged that aggravated circumstances are present in this case.
The defendant has alleged that certain mitigating circumstances are present in this case.
It shall be your duty to determine:
(a) Whether an aggravating circumstance or circumstances are found to exist; and
(b) Whether a mitigating circumstance or circumstances are found to exist; and
(c) Based upon these findings, whether the defendant should be sentenced to life imprisonment or death.
The jury may impose a sentence of death only if it finds at least one aggravating circumstance has been established beyond a reasonable *878 doubt and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.
Otherwise, the punishment imposed shall be imprisonment in the State Prison for life with or without the possibility of parole.
INSTRUCTION NO. 6:
You are instructed that it is not necessary for the defendant to present any mitigating circumstances. Even if the State establishes one or more aggravating circumstances beyond a reasonable doubt and the defendant presents no evidence in mitigation you should not automatically sentence the defendant to death. The law never specifies that a sentence of death is appropriate; the jury however may consider the option of sentencing the defendant to death where the State has established beyond a reasonable doubt that an aggravating circumstance or circumstances exists [sic] and the mitigating evidence is not sufficient to outweight [sic] the aggravating circumstance.

The explanation prompted Canape’s attorney to comment at the beginning of his argument:
I guess I should thank [the prosecutor]. Because the first ten, fifteen minutes of the argument I agreed with him. He really set it out for you as to the death penalty when you are able to and not able to and everything. That saves me time. I can talk about other things. It was a very good explanation of aggravating and mitigating and how it all works.

The instructions read as follows:
INSTRUCTION NO. 10:
Murder of the First Degree may be mitigated by any circumstance you deem appropriate, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime.
INSTRUCTION NO. 10A:
Murder of the First Degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime:
(1) The defendant has no significant history of prior criminal activity.
(2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
(3) The victim was a participant in the defendant’s criminal conduct or consented to the act.
(4) The defendant was an accomplice in a murder committed by another person and his participation in the murder was relatively minor.
(5) The defendant acted under duress or under the domination of another person.
(6) The youth of the defendant at the time of the crime.
(7) Any other mitigating circumstances.

Despite our ruling in the instant case, we emphasize that we expect vigilance on the part of our prosecutors in assuring that only aggravating circumstances that are clearly warranted by the evidence are presented for consideration by the trier of fact.

The United States Supreme Court vacated the Mississippi Supreme Court judgment and remanded the case on the ground that the opinion was virtually silent with respect to the mitigating evidence and how the jury considered that evidence. Clemons, 494 U.S. at 752.

The court personally canvassed Canape in both the guilt and penalty phases to verify that he did not want to testify.

During argument on appeal, this court inquired as to why no mitigating evidence whatsoever was presented. Canape’s counsel, one of Nevada’s most experienced capital case defense lawyers, replied,
Mr. Canape didn’t give us the information we needed for an investigation. He was from out of state, had lived in several places and we had no information we could trace to talk to family members or obtain records or anything else. I believe he was from Jamaica and there was no way of contacting people there, and he lived in some other places. The contacts we attempted to make did not pan out. That is why there is nothing there other than what I argued in my closing argument.

Apparently the jury entertained no doubts about Canape’s guilt and had no questions. It took slightly less than two hours to return the guilty verdict. Eight days later in the penalty phase, the hearing started at 11:05 a.m. The State’s evidence consisted largely of the testimony of Jerry Cohen, whose liquor store Canape robbed seventeen days after Toledo’s death, and an authenticated copy of Canape’s Hawaii conviction in 1983. The case was submitted to the jury at 12:35 p.m. and the verdict returned at 3:20 p.m.

Article 6, Section 4 reads in part: “The supreme court shall have appellate jurisdiction in all civil cases arising in district courts, and also on questions of law alone in all criminal cases in which the offense charged is within the original jurisdiction of the district courts.”

NRS 177.025 provides: “The appeal to the supreme court from the district court can be taken on questions of law alone.”

The Honorable Miriam Shearing, Justice, did not participate in the decision of this matter.