*1359
 
 OPINION
 

 Per Curiam:
 

 On the afternoon of June 12, 1995, Claudia Dukes (Dukes) died from a single gunshot wound to the head after an all-night crack cocaine party at her Las Vegas apartment. Two individuals who were in Dukes’ apartment when she was shot identified appellant Kevin Ray Holmes (Holmes) as the assailant.
 

 At the conclusion of Holmes’s trial, the jury convicted Holmes of one count each of murder with the use of a deadly weapon and attempted murder with the use of a deadly weapon. The district court subsequently sentenced Holmes to two consecutive life terms with the possibility of parole for murder, along with a concurrent sentence of two consecutive twenty-year terms for attempted murder.
 

 Holmes now appeals, arguing that the district court erred in allowing the State to seek a conviction for murder on theories of premeditation and felony-murder after the justice’s court had dismissed the underlying predicate felony of robbery due to insufficient evidence. Additionally, Holmes asserts that the district court’s submission of an erroneous reasonable doubt jury instruction, combined with improper prosecutorial commentary on the meaning of the reasonable doubt standard, constitutes reversible error.
 

 While we reject Holmes’s first assignment of error, we conclude that the errors raised in his second assignment of error were prejudicial. Accordingly, for the reasons set forth below, we reverse Holmes’s conviction and remand for a new trial.
 
 [1]
 

 FACTS
 

 During the afternoon of June 11, 1995, several people gathered in Dukes’ Las Vegas apartment to smoke crack cocaine. Present were Dukes, her niece Sharyl Renee Shaw (Shaw), Derrick Smith (Smith), and appellant Holmes. Throughout the afternoon and evening, Shaw observed that Holmes had in his possession a brown paper bag that Holmes claimed contained large amounts of cash. During the party, Holmes gave money on several separate
 
 *1360
 
 occasions to both Dukes and Smith and directed them to purchase more crack cocaine for the group.
 

 At approximately 7:00 p.m., Holmes and Smith left Dukes’ apartment with the brown paper bag. Approximately forty-five minutes later, they returned to the apartment, whereupon Holmes accused Smith of stealing $100.00 from him. Smith denied taking the money and instead implicated Dukes in the theft. Dukes denied stealing Holmes’s money, and then left her apartment to spend the evening with her sister.
 

 After Dukes had left, Shaw, Smith, and Holmes remained in Dukes’ apartment and continued to smoke crack cocaine. Eventually, Smith departed Dukes’ apartment at 4:30 a.m. Holmes departed at approximately 6:00 a.m., and Shaw departed the apartment at approximately 6:30 a.m.
 

 At approximately 12:00 p.m., Shaw returned to Dukes’ apartment. An hour later, as Shaw was sitting outside in front of Dukes’ apartment complex, Holmes and another man approached Shaw and asked whether Dukes was home. Sensing that something was wrong, Shaw replied that Dukes was not in the apartment and that she did not know where Dukes was. After Holmes had departed, Dukes emerged from her apartment and asked Shaw to go to the store to purchase some beer. While enroute, Shaw encountered a friend named Larry Toler (Toler), who accompanied Shaw to the store and then back to Dukes’ apartment.
 

 After arriving back at Dukes’ apartment, Toler and Shaw — who were both high from smoking crack cocaine that morning — began drinking beer in Dukes’ kitchen. Shortly thereafter, there was a knock at the door; both Toler and Shaw heard Dukes greet an individual and invite him inside. When the individual momentarily entered the kitchen, both Toler and Shaw recognized that the individual was appellant Holmes. Holmes and Dukes then went into the living, room and began conversing.
 

 Approximately ten minutes later, Shaw and Toler, who were both still in the kitchen drinking beer, heard what sounded like a loud firecracker emanate from the living room. Toler dropped his beer, ran from the kitchen, and attempted to exit the apartment through the front door. Before Toler could exit, Holmes grabbed him around the neck from behind, stuck a pistol into his back, and fired. Wounded, Toler managed to struggle free and attempted to jump out the apartment window. During this attempt, Holmes pointed the gun at Toler a second time and fired, but the weapon jammed. Toler and Holmes then both ran from the apartment through the front door, each man running in separate directions upon exiting.
 

 After hearing the first gunshot, Shaw crawled between the stove and refrigerator and remained in this hidden position for several
 
 *1361
 
 minutes. During this time, Shaw heard a second gunshot. After hearing the struggle between Holmes and Toler subside, Shaw ran from the apartment screaming. While fleeing, Shaw observed Dukes, lying on the sofa, along with Dukes’ purse and various items from the purse scattered about the sofa.
 

 Shortly after the shootings, Las Vegas Metropolitan Police Department (LVMPD) officers arrived on the scene. Upon entering the apartment, Det. Franks observed Dukes on the sofa, along with blood, shell casings, and a brown purse near the sofa that had been torn open. Based on his experience, Det. Franks surmised that the shell casings appeared to be from a .380 handgun. Det. Becker also observed a purse that had been torn and its contents spilled out on the sofa.
 

 Dukes was transported to University Medical Center in Las Vegas, where she died from a single gunshot wound to the head. After both Shaw and Toler identified Holmes as the shooter from a photographic lineup, Det. Franks learned that Holmes had moved to Louisiana. On June 19, 1995, LVMPD officers executed a search warrant on Holmes’s Las Vegas apartment and recovered .380 ammunition. On June 21, 1995, LVMPD officers contacted Holmes’s mother in Louisiana and informed her that Holmes was under investigation for Dukes’ murder. On June 23, 1995, after voluntarily agreeing to return to Nevada, LVMPD officers met Holmes at the Las Vegas bus station and placed him under arrest. In his statement to the police, Holmes admitted to being at Dukes’ crack party on the night before she was murdered; however, he denied killing Dukes or wounding Toler on the afternoon of June 12th.
 

 On June 23, 1995, the State filed a criminal complaint charging Holmes with one count each of murder (open) with the use of a deadly weapon, attempted murder with the use of a deadly weapon, and robbery with the use of a deadly weapon. On July 25, 1995, the justice’s court conducted a preliminary hearing during which both Shaw and Toler identified Holmes as the assailant. In support of the robbery charge, the State presented evidence that Dukes’ purse had been torn open and its contents scattered on the living room sofa. At the conclusion of the preliminary hearing, the justice’s court concluded that the State had proffered sufficient evidence to bind Holmes over for trial on the murder and attempted murder charges, but the court dismissed the robbery charge due to insufficient evidence.
 

 On August 1, 1995, the State filed a criminal information charging Holmes with one count each of murder (open) and attempted murder. The State’s charge of open murder alleged two theories of criminal liability: that Holmes had committed premeditated murder; or felony murder, in that Holmes had commit
 
 *1362
 
 ted the killing during the perpetration or attempted perpetration of a robbery.
 

 Holmes’s trial commenced on February 12, 1996. During trial, Shaw and Toler testified on behalf of the State. Although Toler identified Holmes as the shooter, he and Shaw both conceded that they were high on crack cocaine and alcohol when Dukes was murdered. After two days of testimony, the State rested its case. Holmes presented no witnesses or evidence in his defense but instead opted to argue that the State had failed to meet its burden of proving his guilt beyond a reasonable doubt.
 

 During trial, the district court instructed the jury on reasonable doubt as follows:
 

 A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and
 
 substantial,
 
 not mere possibility or speculation.
 

 If you have a reasonable doubt as to the guilt of the defendant, he is entitled to a verdict of not guilty. [
 
 2
 
 ]
 

 (emphasis added) (footnote added).
 

 During closing argument, the prosecutor attempted to illustrate the definition of reasonable doubt by stating:
 

 Well, I submit to you, ladies and gentlemen that in your life when you’re dealing with more weighty affairs, and that’s the first statement, it is not mere possible doubt but such a doubt as would govern or control a person in more weighty affairs in life.
 
 Every day you have something in your personal life that to you is considered a more weighty affair. Obviously, sitting on a murder trial today is a more weighty affair. Buying a car, buying a house. To one person buying a car might be a major weighty affair, buying a house is [sic] weighty affair.
 
 When you go to buy a house or when you go buy a car or anything you’re doing involves a weighty affair in your opinion, you have doubts. But you have to ask yourself, are they reasonable doubts. An example, you go buy a house. Do you want to buy a house that costs you $200,000 but it’s going to be later on a ton of apartment houses built right over your wall that brings the value down. When you
 
 *1363
 
 go there to buy the house, you get there and look at the house and you look at everything in the house and you see the arches and the carpet and you fall in love with it and you want that house, but still have those doubts. God, are they going to build an apartment house near there? Are they going to put a freeway behind me? Is it going to mess up my house? That’s a doubt. But you go ahead and buy the house because of what you saw in that house, because that’s what convinced you.
 

 And that’s exactly what a trial is.
 

 (emphasis added).
 

 At the conclusion of trial, the jury convicted Holmes of one count of first-degree murder and one count of attempted murder. The district court sentenced Holmes to life in prison with the possibility of parole on the first-degree murder charge, with a consecutive life term for the use of a weapon. For the attempted murder charge, the district court sentenced Holmes to a concurrent term of twenty years in prison with an additional twenty-year consecutive sentence for the use of a deadly weapon.
 

 Holmes now appeals.
 

 DISCUSSION
 

 The district court did not violate appellant’s due process rights by allowing the State to prosecute him for murder on theories of premeditation and felony-murder after the justice’s court had dismissed the underlying felony due to insufficient evidence
 

 Holmes contends that the district court violated his right of due process by permitting the State to seek a conviction for murder based on theories of premeditation and felony-murder after the justice’s court had dismissed the underlying predicate charge of robbery due to insufficient evidence. We disagree.
 

 Initially, we note that Holmes failed to object during trial to the State’s reliance on premeditation and felony-murder theories in its attempt to seek a murder conviction. It is well recognized that failure to object at the trial level generally precludes the right to assign error on appeal. Sterling v. State, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992). However, we have decided to reach the merits of Holmes’s argument in order to clarify an important issue for the benefit of the bench and bar.
 

 Pursuant to NRS 200.030, the commission of a felony and premeditation are merely alternative means of establishing the single
 
 *1364
 

 mens rea
 
 element of first degree murder, rather than constituting independent elements of the crime.
 
 [3]
 

 See
 
 also Schad v. Arizona, 501 U.S. 624, 637 (1991) (noting that under Arizona law, “premeditation and the commission of a felony are not independent elements of the crime [of first degree murder], but rather are mere means of satisfying a single
 
 mens rea
 
 element”).
 

 Consistent with our approach, many jurisdictions have held that the State may seek a conviction for murder based on a theory of felony-murder without even charging the underlying predicate felony.
 
 See
 
 Stephens v. Borg, 59 F.3d 932, 935 (9th Cir. 1995); People v. Thomas, 740 P.2d 419, 425 n.5 (Cal. 1987); In re Walker, 518 P.2d 1129, 1139-40 (Cal. 1974) (explaining that where the State intends to rely on a felony-murder theory, the predicate felony need not be pleaded).
 
 See also
 
 State v. Clark, 386 S.E.2d 191, 194 (N.C. 1989) (explaining that a murder indictment in the form prescribed by statute will support a first degree murder verdict based upon any theory set forth in the first degree murder statute).
 

 Accordingly, we reiterate that premeditation and felony-murder are alternate theories upon which the State may rely in its attempt to establish the
 
 mens rea
 
 element of the crime of first degree murder. Although the justice’s court had dismissed the felony robbery charge due to insufficient evidence, the State was not precluded from advancing the theory at trial that Holmes had murdered Dukes during the commission of a robbery. Based on the foregoing, and the fact that Holmes had ample notice of the theories upon which the State planned to rely, we conclude that the district court did not violate Holmes’s due process rights by allowing the State to seek a conviction for murder alleging theories of premeditation and felony-murder.
 
 [4]
 

 
 *1365
 

 The district court’s submission of an erroneous reasonable doubt instruction, combined with improper prosecutorial commentary on the meaning of the reasonable doubt standard, constitutes reversible error
 

 Holmes argues that the district court’s submission of an erroneous reasonable doubt instruction in violation of NRS 175.21 l(l)-(2), combined with the prosecutor’s improper commentary on the reasonable doubt standard, requires reversal of his conviction because such errors enabled “the jury to convict . . . on a lesser burden of proof than is constitutionally required.” We agree.
 

 NRS 175.211 provides:
 

 1. A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.
 

 2.
 
 No other definition of reasonable doubt may be given by the court to juries in criminal actions in this .state.
 
 [
 
 5
 
 ]
 

 (emphasis added) (footnote added).
 

 Although the command of the statute is clear, we have previously held that minor deviations from the statutorily prescribed reasonable doubt instruction constituted harmless error where there was overwhelming evidence of guilt and no other trial error.
 
 See
 
 Meek v. State, 112 Nev. 1288, 1297, 930 P.2d 1104, 1110 (1996) (concluding that the identical reasonable doubt instruction used in the instant case did not, in isolation, constitute reversible error). However, in McCullough v. State, 99 Nev. 72, 75, 657 P.2d 1157, 1158 (1983), we held that the use of a disapproved reasonable doubt instruction constituted reversible error “when coupled with
 
 any
 
 other attempt to supplement, change, or clarify the statutory reasonable doubt definition.”
 

 In the instant case, the district court submitted an erroneous
 
 *1366
 
 reasonable doubt instruction in violation of NRS 175.211, and the prosecutor exacerbated the district court’s error by improperly analogizing reasonable doubt with major life decisions such as buying a house or purchasing a car. The convergence of these two errors during Holmes’s trial brings this case squarely within the purview of the rule we announced in
 
 McCullough.
 

 As we explained in
 
 McCullough,
 
 “[t]he concept of reasonable doubt is inherently qualitative. Any attempt to quantify it may impermissibly lower the prosecution’s burden of proof, and is likely to confuse rather than clarify.”
 
 Id.
 
 at 75, 657 P.2d at 1159. Moreover, because the reasonable doubt standard requires the jury to reach a “ ‘subjective state of near certitude’ on the facts in issue”,
 
 see id.
 
 at 75, 657 P.2d at 1158 (quoting Jackson v. Virginia, 443 U.S. 307, 315 (1979)), we have maintained that prosecutorial commentary analogizing reasonable doubt with major life decisions such as buying a house or changing jobs is improper because these decisions involve elements of uncertainty and risk-taking and are wholly unlike the kinds of decisions that jurors must make in criminal trials.
 
 See
 
 Quillen v. State, 112 Nev. 1369, 1382, 929 P.2d 893, 902 (1996).
 

 Accordingly, we reaffirm our commitment to the rule we announced in
 
 McCullough.
 
 The lower courts of this state must defer to the legislature’s institutional competence and adhere to the statutorily prescribed reasonable doubt instruction codified at NRS 175.211. Additionally, we caution the prosecutors of this state that they venture into calamitous waters when they attempt to quantify, supplement, or clarify the statutorily prescribed reasonable doubt standard.
 

 Therefore, the district court’s submission of an erroneous reasonable doubt instruction in violation of NRS 175.211, in combination with the prosecutor’s improper argument analogizing reasonable doubt with various major life decisions, constitutes reversible error. We cannot say that these errors were harmless.
 

 CONCLUSION
 

 We conclude that the district court did not err by allowing the State to prosecute Holmes for murder on theories of premeditation and felony-murder after the justice’s court had dismissed the underlying robbery felony due to insufficient evidence. However, we conclude that the district court’s submission of an erroneous reasonable doubt instruction, in combination with the prosecutor’s improper argument analogizing reasonable doubt with various major life decisions, constitutes reversible error.
 

 Based on the foregoing, we reverse Holmes’s conviction and remand for a new trial.
 

 [1]
 

 We conclude that Holmes’s conviction warrants reversal solely on this issue. Accordingly, we decline to consider Holmes’s additional arguments that the district court abused its discretion in (1) allowing the .State to endorse four witnesses on the first day of trial, (2) denying his motion for a continuance to investigate the witnesses, and (3) in admitting evidence of his prior bad acts.
 

 [2]
 

 There is a one-word difference between this definition of reasonable doubt, and the definition required by NRS 175.211. The statutorily mandated reasonable doubt definition does not contain the word “substantial.”
 
 See
 
 NRS 175.211.
 

 [3]
 

 In relevant part, NRS 200.030 provides:
 

 1. Murder of the first degree is murder which is:
 

 (a) Perpetrated by means of poison, lying in wait, torture or child abuse, or by any other kind of willful, deliberate and premeditated killing;
 

 (b) Committed in the perpetration or attempted perpetration of sexual assault, kidnapping, arson, robbery, burglary, invasion of the home, sexual abuse of a child or sexual molestation of a child under the age of 14 years; or
 

 (c) Committed to avoid or prevent the lawful arrest of any person by a peace officer or to effect the escape of any person from legal custody.
 

 [4]
 

 In a related argument, Holmes asserts that because the State was allowed to prosecute him for murder based on two theories — premeditation and an allegedly improper theory of felony murder — it is “possible that the jury found [Holmes] guilty without having found that he had the specific intent to kill.” We reject this argument. We have concluded that both theories upon which the State relied — premeditation and felony-murder — were permissible and, thus, Holmes's additional assignment of error is moot. Moreover,
 
 *1365
 
 because the jury need not reach unanimity with respect to either theory,
 
 see
 
 Schad v. Arizona, 501 U.S. 624, 631 (1991), we conclude that the jury's general verdict is unproblematic.
 

 [5]
 

 As previously indicated, unlike the reasonable doubt instruction used at Holmes's trial, the statutorily mandated reasonable doubt instruction does not contain the word “substantial.”
 
 See
 
 NRS 175.211.